UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

JANE ROE,

              Plaintiff,

     v.

CALIFORNIA DEPARTMENT OF
DEVELOPMENTAL SERVICES, et al.,

              Defendants.

Case No. 16-cv-03745-WHO

**ORDER GRANTING IN PART AND
DENYING IN PART MOTIONS TO
DISMISS AND DENYING MOTION TO
STRIKE**

Re: Dkt. Nos. 54, 57, 59

## INTRODUCTION

This case concerns the sexual abuse and rape of plaintiff Jane Roe, a woman with developmental disabilities and mental illnesses in the care of the Sonoma Developmental Center ("SDC") and the California Department of Developmental Services ("DDS"), by SDC employee Rex Bradford Salyer. Roe brings various claims against those she believes to be responsible for her mistreatment: deprivation of civil rights under color of state law pursuant to 42 U.S.C. § 1983 against SDC, DDS, current and former administrators at SDC (Nancy Bargmann, Santi J. Rogers, Therese Delgadillo) and DDS (Aleana Carreon, Karen Faria), Regional Center of the East Bay ("RCEB"), and Salyer; discrimination under the Americans with Disabilities Act ("ADA") and the Rehabilitation Act against DDS, SDC, and RCEB; gender violence against Salyer; sexual harassment in a service or professional relationship against DDS, SDC, and Salyer; violation of the right to freedom from violence under the Ralph Civil Rights Act against DDS, SDC, and Salyer; deprivation of full and equal access to accommodations under the Unruh Civil Rights Act against DDS, SDC, and RCEB; battery against DDS, SDC, and Salyer; negligent hiring, supervision, or retention against DDS, Rogers, Delgadillo, SDC, and Faria; and intentional infliction of emotional distress against DDS, SDC, and Salyer.

Both the State Defendants (SDC, DDS, Bargmann, Rogers, Delgadillo, Carreon, and Faria) and RCEB bring motions to dismiss. The State Defendants also bring a motion to strike portions of the complaint. For the reasons explained below, I grant in part and deny in part both motions to dismiss, and deny the State Defendants' motion to strike.

## BACKGROUND

## I.   FACTUAL BACKGROUND[1]

### A.  Organization of California Inpatient Facilities

DDS is a department within the California Health and Human Services Agency. Consolidated Complaint ("CC") (Dkt. No. 49) ¶ 8. It is responsible for providing programs and living arrangements for Californians with developmental disorders. CC ¶ 8. Nancy Bargmann is the current director of DDS; she was appointed by Governor Edmund G. Brown, Jr. on March 4, 2016. CC ¶ 8. Santi J. Rogers and Therese Delgadillo are former directors of DDS. Rogers was director of DDS from January 2014 until March 2016; Delgadillo was director from 2006 until 2013. CC ¶¶ 10, 11.

Pursuant to the Lanterman-Petris-Short Act ("Lanterman Act"), DDS operates several restrictive facilities for the treatment and care of persons with severe developmental and psychiatric disabilities. CC ¶ 1. The Sonoma Developmental Center ("SDC") is one of these centers. CC ¶ 2. Aleana Carreon is the current executive director of SDC; she assumed that position in or around September 2015. CC ¶ 14. Karen Faria is a former executive director of SDC; she served in that capacity from April 1, 2013 until approximately September 2015. CC ¶ 15.

DDS also works with a series of twenty-one private non-profit organizations known as

---

[1]      For purposes of evaluating defendants' motion to dismiss, I assume the truth of Roe's allegations. I also take judicial notice of four documents as requested by Roe: (1) California Department of Health's ("DPH") letter to Patricia Flannery, Interim Administrator of SDC, dated December 12, 2012, "regarding determination not to renew the Medi-Cal provider agreement and terminate the facility's participation as a Medicaid provider," ; (2) DPH's letter to Flannery, dated December 12, 2012, "regarding SDC's failure to comply with state licensing requirements,"; (3) DPH's Health Citation Number 15-1284-0009501-S, dated December 12, 2012, to SDC,; and (4) Statement of Deficiencies identified at SDC during a survey conducted on July 25, 2014. All are publicly available on the DPH website and no party disputes the authenticity of the website or the accuracy of the documents.

United States District Court
Northern District of California

"regional centers" to determine the most appropriate treatment for each patient, including whether to commit patients to a developmental center. CC ¶ 2. RCEB is one of these centers. CC ¶ 17.

### B. Sonoma Developmental Center's History

SDC has been repeatedly cited for "inferior patient care practices, including failures to prevent sexual assaults on its patients." CC ¶ 27. Since 2000, there have been at least twelve cases of sexual abuse of patients at SDC similar to the present one. CC ¶ 33.

In 2012, the Centers for Medicare & Medicaid Services ("CMS") surveyed SDC. CC ¶ 28. In response to the conditions it found at SDC, CMS issued a Statement of Deficiencies. CC ¶ 28. CMS concluded that SDC's governing body "failed to exercise general operating direction over the facilities" and "failed to ensure compliance with [CMS's Conditions of Participation]" because it did not protect its patients. CC ¶ 28. CMS also found that "[i]ndividuals ha[d] been abused, neglected, and otherwise mistreated and the facility ha[d] not taken steps to protect [these] individuals . . . ." CC ¶ 28. CMS noted concerns over SDC's insufficient number of "competent, trained staff," which it found to be part of SDC's failure to provide adequate care to the patients there. CC ¶ 28. As a result, SDC faced the prospect of losing federal funding. CC ¶ 28.

When CMS issued a notice of intent to decertify SDC's entire Intermediate Care Facility ("ICF") program, DDS and SDC instead withdrew the worst performing units from the certification process for federal funding entirely. CC ¶ 29. Roe resided in one of these units. CC ¶ 29.

SDC entered into an agreement with CMS to improve the conditions of the remaining units. CC ¶ 30. From at least 2010, when Roe was committed to SDC, DDS, SDC, and the directors of DDS and SDC, were aware of the problems in SDC, including the "rampant sexual abuse of patients." CC ¶ 31. Nonetheless, they failed to make the changes necessary to bring SDC into compliance with federal regulations. CC ¶ 31. As a result, SDC lost all federal funding for its ICF units on July 1, 2016. CC ¶ 30.

### C. Jane Roe's Commitment and Assaults

In 2010, RCEB and DDS jointly petitioned a state court to commit Roe to SDC under the California Welfare and Institutions Code § 6500. CC ¶ 35. The court granted the petition, and

3

1    Roe was committed to SDC, where she resided in the ICF.[2]  CC ¶ 35.

2        In May 2013, SDC and DDS hired Salyer as a "psychiatric technician" ("PT") to work at

3    SDC.  CC ¶ 37.  SDC had a policy of pairing patients with PTs, such as Salyer, on a one-on-one

4    basis.  CC ¶ 39.  The PTs could choose with which patients they would work.  CC ¶ 39.  Under

5    this policy, Salyer often chose to work with Roe.  CC ¶ 39.  This marked the beginning of Salyer's

6    sexual abuse of Roe, which continued until his arrest in 2014.  CC ¶¶ 38, 44.  While Salyer was

7    alone with her, he "kiss[ed], fondle[d], and digitally penetrate[d]" her almost daily, and sometimes

8    forced her to perform oral sex on him, despite the fact that she was unable to consent to sexual

9    acts.  CC ¶ 40.  Roe found these acts to be unwanted and abhorrent.  CC ¶ 40.

10       Roe did not report this conduct.  She feared that SDC staff would not believe her and that

11   Salyer would retaliate against her.  CC ¶ 42.  Salyer targeted her in part because he knew she had

12   this fear.  CC ¶ 83.  She repeatedly requested to be paired with a different PT, in particular a

13   female staff member.  CC ¶ 41.  SDC denied all of these requests without further inquiry.  CC ¶

14   41.

15       On July 4, 2014, Salyer raped Roe.  CC ¶ 44.  Still fearing that SDC staff would not

16   believe her, Roe saved her soiled underwear and sheets and hid them until Salyer left the facility.

17   CC ¶ 44.  Later that evening, she informed SDC staff that she was too afraid to go back to her

18   room to sleep; she disclosed the rape and produced the sheets and underwear.  CC ¶ 45.

19   Subsequently, SDC terminated Salyer's employment and reported the rape to the police.  CC ¶ 46.

20       RCEB kept Roe at SDC after the rape.  CC ¶ 48.  She manifested symptoms of post-

21   traumatic stress disorder ("PTSD"), such as swallowing inedible items like batteries and scissors.

22   CC ¶ 48.  In response, on January 28 and 29, 2016, the licensed social worker for Roe's unit, the

23   "professional person in charge," and the acting clients' rights advocate signed a denial of rights

24   ("DOR") that restricted Roe's access to her personal items and subjected Roe to "complete body

25   checks" on a regular basis.  CC ¶ 50.  These body checks forced Roe to remove all of her clothing

26

27   [2]      In Docket Number 59, State Defendants seek to file under seal the State Orders of
     Commitment for Jane Roe to the Sonoma Developmental Center, from August 31, 2010 until
28   September 11, 2015.  Failing to seal these documents would disclose the name and identity of Jane
     Roe.  As a result, Docket Number 59 is GRANTED.

so that staff could inspect the clothing and perform a cavity search, including "her vaginal and anal cavities, and the folds under her breasts." CC ¶ 51.

On April 23, 2016, SDC and RCEB transferred Roe out of SDC and into an apartment of her own, where she now lives independently. CC ¶ 55. Since her transfer, her PTSD has improved; she no longer attempts to swallow inedible items. CC ¶56. She remains under the care of RCEB and may be returned to SDC or another similar facility in the future. CC ¶ 57.

## LEGAL STANDARD

Under Federal Rule of Civil Procedure 12(b)(6), a district court must dismiss a complaint if it fails to state a claim upon which relief can be granted. To survive a Rule 12(b)(6) motion to dismiss, the plaintiff must allege "enough facts to state a claim to relief that is plausible on its face." *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007). A claim is facially plausible when the plaintiff pleads facts that "allow the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted). There must be "more than a sheer possibility that a defendant has acted unlawfully." *Id.* While courts do not require "heightened fact pleading of specifics," a plaintiff must allege facts sufficient to "raise a right to relief above the speculative level." *See Twombly*, 550 U.S. at 555, 570.

In deciding whether the plaintiff has stated a claim upon which relief can be granted, the Court accepts the plaintiff's allegations as true and draws all reasonable inferences in favor of the plaintiff. *See Usher v. City of Los Angeles*, 828 F.2d 556, 561 (9th Cir. 1987). However, the court is not required to accept as true "allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *See In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008).

## DISCUSSION

I first address the two motions brought by the State Defendants and explain why the motion to dismiss should be granted in part and the motion to strike be denied in full. Then I address RECB's motion to dismiss, which I also grant in part. Finally, I explain why Roe's request for injunctive relief against the defendants is permissible at the pleading stage.

5

## II. LIABILITY OF STATE DEFENDANTS

The State Defendants move to dismiss all claims on the basis, essentially, that they cannot be held liable for Salyer's conduct. For the reasons explained below, the State Defendants are vicariously liable for Salyer's conduct and directly liable for their own. Most of the claims against them survive. They also move to strike a swath of the allegations in Roe's complaint that they call "improper," but neither the *Rooker-Feldman* doctrine nor the doctrine of exhaustion of administrative remedies applies here, nor do the State Defendants explain why their objections are appropriate for a Rule 12(f) motion even if they were valid.

### A. Motion to Dismiss

#### 1. Vicarious Liability

The State Defendants argue that Roe's claims against them for violation of Section 504 of the Rehabilitation Act, sexual harassment in a service or professional relationship, violation of the Ralph Civil Rights Act, battery, and intentional infliction of emotional distress must fail because Roe failed to plead sufficient facts to show that the doctrine of respondeat superior applies to DDS or SDC. They contend that they cannot be held liable for Salyer's actions because those actions did not "arise from" his professional responsibilities. State Mot. 11. I disagree; the scope of Salyer's employment did more than merely provide him the opportunity to sexually assault a patient, but fostered a specific kind of relationship between him and Roe, the patient under his care.

The State Defendants rely on *Lisa M. v. Henry Mayo Newhall Memorial Hospital*, 12 Cal. 4th 291 (1995). In *Lisa M.*, a woman who had been sexually assaulted by an ultrasound technician employed by a hospital brought suit against the hospital on a theory of respondeat superior. *Id.* The *Lisa M.* court found that "the employer will not be held liable for an assault or other intentional tort that did not have a causal nexus to the employee's work." *Id.* at 297. The court concluded that vicarious liability only arises where the assault stems from "feelings predictably created" by the professional relationship. *Id.* at 303.

Pointing to the facts of *Lisa M.*, the State Defendants assert that "[t]he practice of one-on-one supervision of a developmentally disabled and mentally ill consumer by a PT provides no

occasion for work-related emotional involvement[.]" State Mot. 12. But the relationship of a patient and a "psychiatric professional" that evolves over the course of two years in the context of involuntary commitment is distinct from the one-time relationship of an ultrasound technician and an expectant mother. Roe has alleged that SDC had a policy of pairing PTs with patients on a one-on-one basis and specifically allowing PTs to choose with which patients they would work. Because these PTs worked with patients over the course of an extended period of time, it is reasonably foreseeable that their relationship could develop far beyond the relationship of the technician and his victim in *Lisa M.* Moreover, in *Lisa M.*, the assault took place in an exclusively professional setting. Not so here; in a residential mental health facility such as SDC, the setting is not only a workplace, but the patient's home as well. CC ¶ 35, 37.

Employers can also be held vicariously liable for sexual assaults committed by their employees where the employee had significant power over his victim. Such liability exists even where the relationship between the employee and his victim was less developed than as here. In *Doe v. Capital Cities*, 50 Cal. App. 4th 1038 (1996), an employer was held liable for sexual abuse committed by an employee, its casting director. The *Doe* court explained that because of the casting director's position of power, there was a predictable risk that he might sexually abuse aspiring actors. *Id*. at 1050. Salyer held similar power over Roe—he was charged with her care, she was unable to leave the facility, and because of her disabilities few would believe her if she reported the assaults.

This reasoning extends to the psychiatric treatment context. The Ninth Circuit has endorsed the notion that patients are particularly vulnerable to inappropriate sexual conduct by those providing psychiatric treatment. *Simmons v. United States*, 805 F.2d 1363, 1370 (9th Cir. 1986). The relationship between Roe and Salyer was at least on par with that of a psychiatrist and his patient: by virtue of his professional responsibilities, Salyer had detailed knowledge of Roe's weaknesses and disabilities, in the same way a psychiatrist would. For almost two years, Roe spent much of each day alone with Salyer. CC ¶ 39. Much of that time was spent in Roe's residence, which she was unable to leave. CC ¶ 35, 37.

That some of the State Defendants are public entities does not change the calculus. "A

public entity is liable for injury proximately caused by an act or omission of an employee of the public entity within the scope of his employment if the act or omission would . . . have given rise to a cause of action against that employee . . ." Cal. Gov. Code § 815.2(a). The California Supreme Court has found a high school district liable for the negligence of its administrators and supervisors in "hiring, supervising and retaining" an employee who sexually assaulted a student. *C.A. v. William S. Hart Union High Sch. Dist.*, 270 P.3d 699, 711 (Cal. 2012). As an example, a plaintiff making a claim of liability against a public entity need not explicitly plead its basis upon "a specific statute declaring them to be liable, or at least creating some specific duty of care." *Eastburn*, 80 P.3d at 660.

For these reasons, I find that the State Defendants can be found vicariously liable for Salyer's actions. The State Defendants' motion to dismiss on this basis is DENIED.

### 2. Section 1983

The parties now agree that Roe's only Section 1983 claims are stated against defendants Rogers and Faria in their individual capacities and disagree whether Roe has a plausible claim. To establish a Section 1983 claim, a plaintiff must establish that (1) the defendant deprived them of a cognizable constitutional or federal right and (2) the defendant acted under "color of state law." *Gomez v. Toledo*, 446 U.S. 635, 640 (1980). The State Defendants contest that they deprived Roe of a cognizable right.

Both parties rely on *Youngsberg v. Romeo*, 457 U.S. 307 (1982), in which the Supreme Court found that, while involuntarily committed patients have a constitutionally protected interest in "conditions of reasonable care and safety, reasonably nonrestrictive confinement conditions, and such training as may be required by these interests," the federal judiciary should minimize interference in the internal operations of mental institutions. *Id*. at 322-23, 327. Accordingly, treatment decisions made by qualified professionals should be considered "presumptively valid." *Id*. at 323. Liability may only be found where the decision made is "such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible actually did not base the decision on such a judgment." *Id*.

In the Ninth Circuit, this standard is met where the professional's decision "is so

1    objectively unreasonable as to demonstrate that he or she actually did not base the challenged

2    decision upon professional judgment." *Estate of Conners v. O'Connor*, 846 F.2d 1205, 1208 (9th

3    Cir. 1988). This test is "equivalent to that required in ordinary tort cases for a finding of

4    conscious indifference amounting to gross negligence." *Id*.

5        The parties disagree whether the treatment to which Roe was subjected meets the standard

6    of "a substantial departure from accepted professional judgment." *Id*. The State Defendants'

7    argument goes only to Roe's involuntary commitment; they do not address the primary issue

8    raised in Roe's complaint--the circumstances that gave rise to Roe's sexual assault and eventual

9    rape.

10       Roe alleges that administrators at SDC were "aware of increased incidence of patient abuse

11   . . . since at least 2012." CC ¶ 28. This included at least twelve instances of sexual abuse since

12   2000. CC ¶ 33. Roe points to numerous reports indicating the abuse, and the failure of SDC to

13   address systemic problems. She notes that the consistent failure to address these problems

14   culminated in the withdrawal of federal funding from four of SDC's units, including the one in

15   which Roe resided. Oppo. to State Mot. at 8-9. Roe alleges that both Faria and Rogers

16   maintained policies and practices that posed imminent harm to the patients entrusted to their care,

17   even though they were aware of the dangers these practices posed. CC ¶¶ 31, 70.

18       These facts plausibly allege liability under Section 1983. "Administrators of state mental

19   health facilities are liable under section 1983 for policies and procedures, or lack thereof, that are

20   consciously indifferent to patient safety and substantially deviate from professional standards."

21   *O'Connor*, 846 F.2d at 1209. In *O'Connor,* the Ninth Circuit addressed the liability of a facility

22   similar to SDC in which a civilly committed patient had been murdered by a criminally-

23   committed, or penal code, patient there. *Id*. at 1206-07. It found that the defendant facility's

24   inadequate procedures and training "despite a history of violence among penal code patients,"

25   supported a finding of liability. *Id*. at 1208-09.

26       The allegations in the present case parallel the facts of *O'Connor*. SDC's administrators,

27   like the *O'Connor* administrators, were aware of, yet failed to address, conditions in the facility

28   posing "either imminent danger" or "substantial probability that [patient] death or serious physical

9

harm would occur." Roe Req. for Jud. Not. at ¶ 3; *see also* CC ¶¶ 28, 33. This meets the standard of "conscious indifference amounting to gross negligence." *O'Connor*, 846 F.2d at 1208. Roe has adequately pleaded a claim against Rogers and Faria in their individual capacities under Section 1983.

### 3. Disability Discrimination

Roe brings claims of discrimination on the basis of disability under two federal statutes. First, she contends that the State Defendants violated Title II of the ADA, 42 U.S.C. § 12132, which prohibits discrimination on the basis of disability in "participation in" or "the benefits of the services, programs, or activities of a public entity." *Id.* Second, she claims that the State Defendants violated Section 504 of the Rehabilitation Act, 29 U.S.C. § 794(a), which prohibits "exclud[ing] from the participation in . . . den[ying] the benefits of or . . . subject[ing] to discrimination under any program or activity receiving Federal financial assistance" any person "solely by reason of her or his disability." *Id.* The ADA and Rehabilitation Act confer nearly identical rights and obligations and are often analyzed together. *See Zukle v. Regents of Univ. of California*, 166 F.3d 1041, 1045 n. 11 (9th Cir. 1999).

The primary point of contention between the parties is whether Roe can show that she was discriminated against because of her disability. In particular, the State Defendants argue that Roe did not allege any facts "showing that she was treated differently [from] an able-bodied consumer at SDC 'because of' her disability." State Mot. at 14. Roe's direct liability claims do not allege sufficient facts, but her vicarious liability claims do.

Roe must show that she was treated differently than she would have been treated if she were not disabled. In *Taylor v. Colorado Department of Health Care Policy and Financing*, 811 F.3d 1230, 1235 (10th Cir. 2016), a disabled Medicaid claimant objected to a state agency refusing to pay for expenses related to her trips to and from medical appointments. In ruling against Taylor, the Tenth Circuit compared her to "other Medicaid recipients who reside in her county." The court concluded that because Taylor was treated the same as other Medicaid recipients, she was unable to make the requisite showing of discrimination. *Id.* Likewise, in *Aiken v. Nixon*, 236 F.Supp.2d 211 (N.D.N.Y. 2002), a district court dismissed a complaint against a psychiatric

1   facility arising from strip searches of patients. It explained that the complaint provided "no factual

2   basis on which a finder of fact could conclude the disabled who seek to enter [the facility] as a

3   patient . . . are treated any differently than an 'able-bodied' individual who attempts the same

4   treatment." *Id*. at 225-26.

5        Roe contends that those cases are unpersuasive because the state generally has no

6   affirmative duty toward its citizens. Oppo. to State Mot. 13. It is unclear how this distinguishes

7   those two cases from this one. Both *Aiken* and the present case involve a state-affiliated

8   psychiatric facility and objections by patients to the care they received. *Taylor* and *Aiken* speak to

9   the showing required to establish discrimination, not the level of care the state must provide.

10       Roe's primary argument is that the ADA is a mechanism by which disabled persons may

11   vindicate their constitutional rights. While the purpose of the ADA is "to invoke the sweep of

12   congressional authority, including the power to enforce the fourteenth amendment . . .," 42 U.S.C.

13   § 12101(b)(4), this does not free a plaintiff from demonstrating that she was discriminated against

14   "because of" her disability. The stated purpose of the ADA is to "address the major areas of

15   discrimination faced day-to-day by people with disabilities." *Id*.

16       Roe invokes *United States v. Georgia*, 546 U.S. 151 (2006) to argue that a disabled person

17   may sue under Title II to vindicate her constitutional rights. That is of course true, but it does not

18   do away with the requirement of a showing of discrimination "because of" disability. Instead,

19   *United States v. Georgia* recognizes that the ADA establishes a private cause of action for

20   violation of the Fourteenth Amendment. *Id*. at 158-69. The disabled prisoner who brought the

21   constitutional claims via the ADA in that case based them on discrimination because of his

22   disability: he "alleged deliberate refusal of prison officials to accommodate [the prisoner's]

23   disability-related needs in such fundamentals as mobility, hygiene, medical care, and virtually all

24   other prison programs[.]" *Id*. at 157. Similarly, Roe must plead facts that show discrimination on

25   the basis of her disability, not that she is disabled and has been subject to any constitutional

26   violation.

27       Roe has not met this standard for her direct liability claim. She argues that there were two

28   instances of discrimination against her: first, the deliberate indifference of administrators to her

United States District Court
Northern District of California

right to be free from sexual abuse; and second, her traumatic exposure to strip-searches.  Oppo. to State Mot. 13.  At no point does Roe allege that she was treated differently "because of" her disability, except for the purposes of treatment.  But the ADA and Rehabilitation Act prohibit "discrimination because of disability, not inadequate treatment for disability."  *Simmons v. Navajo County*, 609 F.3d 1011, 1022 (9th Cir. 2010) (requiring demonstration of discrimination "because of" disability, rather than inadequate treatment, in ADA context); *Walton v. U.S. Marshalls Serv.*, 492 F.3d 998, 1005 (9th Cir. 2007) (requiring the same in Rehabilitation Act context).  While Roe's treatment at the hands of the State Defendants subsequent to her rape was flawed, she fails to plead the necessary facts to plausibly allege that they discriminated against her because of her disability.[3]

Roe also argues that the State Defendants are vicariously liable for Salyer's actions, which did constitute discrimination against her because of disability.  As explained above, employers can be held vicariously liable for violation of federal disability rights by their employees.  *See Duvall v. City of Kitsap*, 260 F.3d 1124, 1141 (9th Cir. 2001) ("When a plaintiff brings a direct suit under either the Rehabilitation Act or Title II of the ADA against a municipality . . . the public entity is liable for the vicarious acts of its employees" because "the doctrine [of respondeat superior] would be entirely consistent with the policy of that statute, which is to eliminate discrimination against the handicapped." (internal quotation marks and citations omitted)).  Roe has pleaded that Salyer targeted her because the staff would be disinclined to believe her as a result of her disability.  Oppo. to State Mot. 13.  Salyer's decision to target Roe on this basis was the "but for" causation of the assault.  It constitutes discrimination "because of" her disability for which the State Defendants are vicariously liable.

The State Defendants' motion to dismiss is therefore GRANTED as to Roe's direct liability claims brought under the ADA and Rehabilitation Act.  It is DENIED as to Roe's

---

[3]    For the same reasons, Roe's Unruh Civil Rights Act direct liablity claim against the State Defendants fails.  The Unruh Act requires a plaintiff to allege "willful, affirmative misconduct" and discrimination on the basis of a protected characteristic.  *Koebke v. Bernardo Heights Country Club*, 36 Cal.4th 824, 854-54 (2005); *see also Young v. Facebook, Inc.*, 790 F. Supp. 2d 1110, 1116 (N.D. Cal. 2011).  As explained, Roe has not done this.

vicarious liability claims. [4]

### 4. Negligent Hiring

The State Defendants argue that they are not liable for negligent hiring, supervision, or retention because (1) there is no statutory basis upon which to hold DDS and SDC directly liable and (2) Roe did not allege sufficient facts to assert the claim against Rogers, Delgadillo, and Faria. I disagree. Roe has pleaded sufficient facts to establish that Rogers, Delgadillo, and Faria knew of dangerous conditions at SDC and, knowing this, failed to take steps to address those conditions. Moreover, as discussed above, public entities can be held vicariously liable for the actions of their administrators within the scope of employment.

### i. Direct Liability of Rogers, Delgadillo, and Faria

California Government Code section 820.8 precludes liability for public employees caused by the "acts or omissions of another person." It also states that it should not be construed as exonerating any employee from an injury "proximately caused by his own negligent or wrongful act or omission."

The State Defendants contend that Roe failed to plead sufficient facts that the actions of Rogers, Delgadillo, and Faria amounted to negligence in the supervision, hiring, or retention of Defendant Salyer." State Mot. 16. I disagree. Roe has pleaded that Rogers, Delgadillo, and Faria were responsible for training and supervising Salyer. CC ¶ 149. While under their supervision, Salyer sexually assaulted Roe on an almost daily basis for nearly two years. CC ¶ 151. They ignored Roe's requests to be paired with a female PT and not with Salyer. CC ¶ 41. Moreover, they were allegedly aware of a rampant problem of patient abuse by staff at SDC and failed to address it. CC ¶ 151. At the pleading stage, Roe need not state what type of training or supervision would prevent the harm that came to her; she need only show that she was wronged

---

[4]     The State Defendants argue, and Roe agrees, that there is no private right of action for the failure of a facility to conduct a self-evaluation. State Mot. 14; Oppo. to State Mot. 14. However, Roe states that she does not base her ADA claims upon such a private right of action; she pleaded the State Defendants' failure to conduct self-evaluation under the ADA as part of the factual basis for establishing her ADA claim. Oppo. to State Mot. 14. As a result, I will not require her to amend her complaint to omit any mention of the State Defendants' failure to comply with this requirement of the ADA.

United States District Court
Northern District of California

and is entitled to relief.  *See* Fed. R. Civ. P. 8(a).  Roe has adequately pleaded this claim against the individual defendants.

### ii.      Vicarious Liability of DDS and SDC

The California Tort Claims Act, Cal. Gov. Code § 810 *et seq*., requires that direct tort liability of a public entity "must be based on a specific statute declaring them to be liable, or at least creating some specific duty of care."  *Eastburn v. Reg'l Fire Prot. Auth.*, 80 P.3d 656, 660 (Cal. 2003).  On this basis, the State Defendants argue that DDS and SDC cannot be held liable, as Roe did not assert a statutory basis for liability in her complaint.  The State Defendants' argument is off the mark.  Roe's claim against DDS and SDC for negligent hiring, supervision, or retention is based on a vicarious liability theory, not a direct liability theory.  Oppo. to State Mot. 16.  Because Roe has also adequately pleaded her claim against Rogers, Delgadillo, and Faria, her claim for vicarious liability against DDS and SDC also survives the motion to dismiss.  *See* I.A.1, above.  The State Defendants' motion to dismiss this claim is DENIED.

### 5.      California Ralph Civil Rights Act

Section 51.7 of the California Ralph Civil Rights Act ("Ralph Act") provides that "[a]ll persons . . . have the right to be free from any violence, or intimidation by threat of violence committed against their persons or property" on the basis of a wide variety of protected characteristics, including gender and disability.  Cal. Civ. Code § 51.7.  In order to establish a claim under the Ralph Act, the plaintiff must show, "(1) the defendant threatened or committed violent acts against the plaintiff; (2) the defendant was motivated by his perception of plaintiff's [protected class]; (3) the plaintiff was harmed; and (4) the defendant's conduct was a substantial factor in causing the plaintiff's harm."  *Warren v. Marcus*, 78 F. Supp. 3d 1228, 1248 (N.D. Cal. 2015).

### i.      Violence or Threat of Violence

The State Defendants argue that they are not liable because "there is no factual allegation" in the Complaint of "violence or any threat of violence" in the course of Sayler's sexual abuse of Roe.  State Mot. 15.  Nonsense.

"Short of homicide, [rape] is the ultimate violation of self, and apart from homicide it is

hard to imagine any crime that has a greater tendency to involve purposeful, violent, and aggressive conduct." *United States v. Terrell*, 593 F.3d 1084, 1091 (9th Cir. 2010) (internal quotation marks and citations omitted) (alteration in original). As a result, rape is considered a "violent" offense in a variety of contexts, regardless of whether the defendant employed physical force. *See Furman v. Georgia*, 408 U.S. 238, 458-59 (1972) (Powell, J., dissenting) ("The several reasons why rape stands so high on the list of serious crimes are well known: [i]t is widely viewed as the most atrocious of intrusions upon the privacy and dignity of the victim; never is the crime committed accidentally; rarely can it be said to be unpremeditated; often the victim suffers serious physical injury; the psychological impact can often be as great as the physical consequences; in a real sense, the threat of both types of injury is always present."); *United States v. Riley*, 183 F.3d 1155, 1158–59 (9th Cir. 1999) ("Personal contact is, of course, part and parcel of simple rape or its attempt. . . . [N]o matter how committed, every time a perpetrator engages in or attempts to engage in an act of rape, some contact with the victim is achieved. Such close proximity coupled with the nature of this offense creates an atmosphere that fosters the potential for physical confrontation. Even in its least violent form, simple rape . . . could result in physical injury to the victim."). Sexual assault is also inherently violent. *United States v. Terrell*, 593 F.3d 1084, 1090 (9th Cir. 2010) ("[T]he "typical" case of ordinary sexual assault does indeed involve violent and aggressive conduct.").

Sexual assault and rape constitute "violence" under the Ralph Act, regardless of "force." "[T]here is no requirement that the violence be extreme. . . . If the California legislature wanted to limit the reach of the statute to extreme, criminal acts of violence, it could have explicitly said so." *Winarto v. Toshiba Am. Elecs. Components, Inc.*, 274 F.3d 1276, 1289 (9th Cir. 2001). In *Winarto*, the Ninth Circuit held that a plaintiff being kicked "at least once" constituted a violation of the Ralph Act. *Id.* at 1289. Repeated sexual assault over the course of nearly two years, and rape, constitutes an act of violence greater than a single kick.[5] Roe sufficiently pleaded that

---

[5] By contrast, acts such as shining a laser pointer into a plaintiff's camera, pulling a rope barrier against a plaintiff's body, and throwing ice and two sticks at a plaintiff's camera have been found not to constitute "violence" under the Ralph Act. *Campbell v. Feld Entm't, Inc.*, 75 F. Supp. 3d 1193, 1206-08 (N.D. Cal. 2014). These are hardly comparable to the repeated sexual

Salyer used "violence" against her within the meaning of the Ralph Act.

### ii. "Because of" Gender and Disability

The State Defendants further allege that "even if" Roe did allege "violence or threat of violence" against her, she cannot establish that it was "because of her disability or gender." State Mot. 15. This is also a silly argument. Salyer selected Roe because she was a woman: his conduct toward her focused on Roe's primary and secondary sex organs. In the course of sexually assaulting Roe over the course of nearly two years, Salyer fondled Roe's breasts, penetrated her vagina digitally, and vaginally raped her. CC ¶¶ 40, 107. These are acts he would not, and could not, have perpetrated if Roe were a man.

Such behavior has been found to be "because of" the victim's sex or gender in other contexts. As the Ninth Circuit has held in a Title VII context, "grabbing, poking, rubbing or mouthing areas of the body linked to sexuality . . . is inescapably 'because of ... sex.'" *Rene v. MGM Grand Hotel, Inc.*, 305 F.3d 1061, 1066 (9th Cir. 2002). Likewise, in a case brought under the Gender Motivated Violence Act, the Ninth Circuit explained that "rape *by definition* occurs at least in part because of gender-based animus." *Schwenk v. Hartford*, 204 F.3d 1187, 1203 (9th Cir. 2000) (emphasis in original).

Regardless of how they are perpetrated, sexual assault and rape are gender-based crimes. The Ninth Circuit has found that "[i]t would be both an impossible and an unnecessary task to fashion a judicial test to determine whether particular rapes are due in part to gender-based animus. With respect to rape and attempted rape, at least, the nature of the crime dictates a uniform, affirmative answer to the inquiry." *Id*. Salyer targeted Roe for sexual assault and rape "because of" her sex.

Unlike rape and sexual assault, which have a long history of being considered gender violence, there has been no development in the case law that victimization of a disabled person by a provider is *per se* done "because of" disability. Further, "[i]t is unclear whether the statute requires bias to be the sole motivation, a substantial part of the motivation, or an incidental

---

assault and rape of a patient by the person supposedly providing for her care.

motivating factor." *Winarto*, 274 F.3d at 1296 n.15. However, it may be sufficient to find that the victim's protected characteristic was "at least a substantial factor" in the decision to target her. *Id*.

In other contexts, referring to the victim by reference to a protected characteristic has sufficed. *Winarto*, 274 F.3d at 1290. For example, the use of epithets may constitute "strong evidence of racial animus." *Warren v. Marcus*, 78 F. Supp. 3d 1228, 1248 (N.D. Cal. 2015). Roe pleads that Salyer assaulted her while she was in his care and that Salyer targeted her "because" he knew "others would be disinclined to believe the word of a mental patient over him." Oppo. to State Mot. 13; CC ¶ 83. This allows for a reasonable inference that Salyer treated Roe differently, and worse, on the basis of her disability--that he targeted her for sexual assault and rape because she was disabled, and would not have done so if she had not been disabled.

To survive a motion to dismiss, a plaintiff need only show that it is "plausible that the defendant "acted unlawfully," not that it was "probable." *See Iqbal*, 556 U.S. at 678. Roe has sufficiently pleaded that Salyer was motivated by "animus," and targeted Roe "because of" her disability for the purposes of the Ralph Act. The State Defendants' motion to dismiss this claim is DENIED.

### B. Motion to Strike

The State Defendants bring a motion to strike what they claim to be "improper allegations" under Federal Rule of Civil Procedure 12(f), which provides, "Upon motion made by a party before responding to a pleading . . . or upon the court's own initiative at any time, the court may order stricken from any pleading any insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." "The function of a 12(f) motion to strike is to avoid the expenditure of time and money that must arise from litigating spurious issues by dispensing with those issues prior to trial." *Whittlestone, Inc. v. Handi-Craft Co.*, 618 F.3d 970, 973 (9th Cir. 2010).

The State Defendants raise two arguments in favor of their motion to strike. First, they claim that the *Rooker-Feldman* doctrine renders the allegations related to Roe's involuntary commitment and psychiatric treatment outside the jurisdiction of this court. State Mot. 4-5. Second, they contend that Roe failed to exhaust her administrative remedies under the Lanterman

Act.  State Mot. 5-6.

### 1.    *Rooker-Feldman*

The analysis of a motion to strike begins by asking whether the relevant claims are "(1) an insufficient defense; (2) redundant; (3) immaterial; (4) impertinent; or (5) scandalous."  *Id*. at 973-974.  The State Defendants do not argue that any of the claims brought fall within these five categories.  State Mot. 4-6.  Instead, they argue that the complaint contains impermissible collateral attacks on commitment orders issued by state courts.  *See* State Mot. 4-5.  In doing so, they cite to the *Rooker-Feldman* doctrine, under which "a party losing in state court is barred from seeking what in substance would be appellate review of the state judgment in a United States district court, based on the losing party's claim that the state judgment itself violates the loser's federal rights."  *Johnson v. De Grandy*, 512 U.S. 997, 1005-06 (1994).  The State Defendants say that by claiming that RCEB and DDS "failed to explore less restrictive treatment options," that SDC "unnecessarily isolated plaintiff," and seeking an injunction preventing Roe from being returned to an institution without her consent, Roe seeks appellate review of the state court judgments committing her.  State Mot. 5 (internal quotation marks and citations omitted).  As a result, the State Defendants conclude, these claims are outside of the jurisdiction of any federal district court.  *Id*.

Roe rightly notes that the State Defendants have not shown that any of her claims fall within the ambit of Rule 12(f) because they have not argued that any claim is a "redundant, immaterial, impertinent, or scandalous matter."  Oppo. to State Mot. 2 (internal quotation marks and citation omitted).  Although the State Defendants assert that this court lacks jurisdiction to hear some of Roe's claims under the *Rooker-Feldman* doctrine, they make no argument that the claims that fall within the *Rooker-Feldman* doctrine are necessarily appropriate for dismissal under Rule 12(f).  *Whittlestone*, 618 F.3d at 973 (improper to strike claim for lost profits and consequential damages because courts may not resolve disputed and substantial factual issues in deciding a motion to strike).

The State Defendants insist that "the jurisdictionally defective claims are intertwined with claims over which this Court does have jurisdiction" and that, as a result "a Motion to Strike is the

18

only remedy" available to them. State Mot. 4 n.3. This does not cure the defect of their motion, which fails to connect the State Defendants' *Rooker-Feldman* doctrine argument to the requirements of Rule 12(f). I am not empowered to change the requirements of the Federal Rules of Civil Procedure on the basis of the State Defendants' policy concerns. *Cf. In re Glenfed*, 42 F.3d at 1546 ("We are not permitted to add new requirements to Rule 9(b) simply because we like the effects of doing so.").

Substantively, the *Rooker-Feldman* doctrine is narrower than the State Defendants purport it to be and Roe's claims do not fall within it. The Supreme Court has "emphasize[d] the narrowness" of the doctrine. *Lance v. Dennis*, 546 U.S. 459, 464 (2006). Application of the *Rooker-Feldman* doctrine requires that the Sate Defendants establish three prerequisites that they do not meet in their motion: "(1) [t]he party against whom the doctrine is invoked must have been a party to the prior state-court judgment or have been in privity with such a party; (2) the claim raised in the federal suit must have been raised or intertwined with the state-court judgment; and (3) the federal claim must not be parallel to the state-court claim." *Id*. at 462 (internal quotation marks, citation, and modification omitted).

While the State Defendants assert that Roe essentially challenges the commitment orders issued by State courts, none of challenged allegations are directed at a state court order. That State Defendants failed to explore less restrictive treatment options in violation of Plaintiff's rights is not an allegation that the state court order committing Roe constituted a violation; rather, Roe alleges that it was the actions of the State Defendants prior to seeking that order which violated her rights. Roe's allegation that she was unnecessarily isolated is not a challenge to a state court order--her isolation was not instituted pursuant to any court order, but rather to a "Denial of Rights" signed by a social worker, a "professional person in charge," and a "Clients' Rights Advocate." CC ¶ 50. Nor does the threat of future involuntary placement in an institutionalized setting challenge any existing state court order.

The State Defendants' objections fail to meet the requirements of *Rooker-Feldman* in other ways, too. For example, they fail to demonstrate that the claims raised before this court were "raised or inextricably intertwined with the state-court judgment." *Lance*, 546 U.S. at 562.

Instead, they merely argue that "[a]n issue is considered inextricably intertwined with a state court's decision where the district court must hold the state court wrong in order to find in favor of the plaintiff." State Mot. 4-5 (internal quotation marks and citation omitted). They do not explain how any of the allegations to which they object require me to "hold [a] state court wrong" in order to find in favor of Roe.

**2. Exhaustion of Administrative Remedies**

The State Defendants also assert that Roe failed to exhaust her administrative remedies under the Lanterman Act and, as a result, cannot allege her wrongful placement at SDC as opposed to placement in a community setting, the failure to pair her with a female staff member, or the decision to strip-search her when she manifested signs of PTSD. State Mot. 5-6. Roe raises four persuasive answers to this argument.

First, Roe argues that "no court has extended the Lanterman Act's fair hearing requirement to bar factual allegations in a pleading." Oppo. to State Mot. 5. Although Roe makes this claim with no citation to authority, the limited case law that exists on this subject appears to support her conclusion. *See In re Conservatorship of Whitley*, 66 Cal. Rptr. 3d 808, 818 (Cal. App. 4th 2007) (applying exhaustion to claims, not pleaded facts, under the Lanterman Act); *Michelle K. v. Superior Court*, 164 Cal. Rptr. 3d 232, 255 (Cal. App. 4th 2013) ("[W]hen the Legislature creates an administrative tribunal to *adjudicate an issue* before presenting it to the trial court, the party must first pursue its remedies with that tribunal *because the issue* falls within the administrative tribunal's special jurisdiction." (emphasis added)).

Moreover, two features of the exhaustion doctrine, as applied to the Lanterman Act, suggest that it does not apply to pleading allegations as opposed to claims. The requirement of exhaustion of administrative remedies is jurisdictional in nature. *See McAllister v. City of Monterey*, 147 Cal. App. 4th 253, 274 (2007) ("[W]here an adequate administrative remedy is provided by statute, resort to that forum is a 'jurisdictional' prerequisite to judicial consideration of the claim." (internal quotation marks and citations omitted)). Pleaded facts can be barred by other means, not by jurisdictional objections. Further, the doctrine applies only where "an administrative remedy is provided by statute." *Whitley*, 66 Cal. Rptr. 3d at 818. This requirement

20

would be nonsensical if the doctrine also barred factual pleadings.

Second, Roe contends that in order to trigger the Lanterman Act, the State Defendants would have had to provide notice for any change in services, which they did not do. Cal. Welf. & Inst. Code § 4710(a). Given that the bare minimum of due process is "notice and an opportunity to be heard," *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 174 (1974)*, Roe is not precluded from raising her allegations if she was unable to raise them before an administrative tribunal.

Third, Roe's "factual allegations concerning her request to be paired with a female staff member and to strip-searches are relevant to her constitutional claims, thus falling beyond the Act's scope." Oppo. to Mot. 5. As explained, the Lanterman Act does not bar factual allegations even where the plaintiff has not exhausted the administrative process.

Fourth, Roe notes that exhaustion of state administrative remedies is "not required as a prerequisite to bringing an action pursuant to § 1983." Oppo. to State Mot. 5 (quoting *Patsy v. Bd. of Regents of State of Fla.*, 457 U.S. 496, 519 (1982)). Were I to find the arguments of the State Defendants persuasive on every other point, which I do not, Roe's Section 1983 claims would survive the motion to strike for this reason.

Finally, even if I did find that Roe failed to exhaust her administrative remedies, the State Defendants' motion would still not fulfill the requirements of Rule 12(f). Objected-to allegations must be "(1) an insufficient defense; (2) redundant; (3) immaterial; (4) impertinent; or (5) scandalous." None of the allegations fit that description. The State Defendants' motion to strike is DENIED.

## II. RCEB'S MOTION TO DISMISS

Roe brings claims against RCEB under Section 1983, the ADA, the Rehabilitation Act, and the Unruh Civil Rights Act. RCEB moves to dismiss all but the claim under the Rehabilitation Act. I deny its motion concerning Section 1983, and grant the rest.

### A.  Section 1983

There are no cases that discuss whether a regional center like RCEB is subject to suit under Section 1983. Determining whether RCEB is a potentially liable under Section 1983 requires two inquiries; whether a corporation is a "person" under Section 1983 and whether RCEB is acting

under color of state law. While it is a close question, I conclude that Roe has plausibly alleged that RCEB is subject to suit under Section 1983. Discovery and subsequent fact-finding will determine if RCEB is in fact properly named and whether the underlying claim has merit.

### 1. Person under Section 1983

RCEB contends that it is not a "person" within the meaning of Section 1983 because it is a nonprofit corporation created by state law. This argument lacks merit. Generally, a corporation is considered a "citizen or other person" for the purposes of bringing actions under Section 1983. *See, e.g.*, *White Mountain Apache Tribe v. Williams*, 810 F.2d 844, 867 (9th Cir. 1985)(allowing a Native American tribe to bring a Section 1983 action because it was "acting as a business corporation" and "private corporations qualify as 'citizens' or 'other persons'" entitled to bring such actions). That is true for public corporations, *see Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690 (1978)(holding that municipal corporations are "persons" under Section 1983 and not entitled to absolute immunity) and private ones performing public functions. *See Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 295 (2001)(private not for profit corporation organized to regulate interscholastic sports subject to suit under Section 1983); *Coronel v. Paul*, 225 Fed.Appx. 575 (9th Cir. 2007)(determining that a corporation operating private prisons could be liable to a state prisoner for a Section 1983 claim).

RCEB relies on *Sellers v. Regents of University of California*, 432 F.2d 493 (9th Cir. 1970) to argue that it constitutes neither a "person" nor a "state actor" for the purposes of Section 1983. *Sellers* found that the University of California could not be sued under Section 1983 because it was a corporation created by the California constitution and therefore "not a proper party since it is not a 'person'" for the purposes of that section. *Id*. at 500. *Sellers* is inapposite. Though the Ninth Circuit did not elaborate on its reasoning in *Sellers*, it has repeatedly determined that the University of California is an "arm of the state." *E.g.*, *Armstrong v. Meyers*, 964 F.2d 948, 949–50 (9th Cir.1992); *Thompson v. City of L.A.*, 885 F.2d 1439, 1443 (9th Cir.1989); *BV Eng'g v. Univ. of Cal.*, 858 F.2d 1394, 1395 (9th Cir. 1988); *Jackson v. Hayakawa*, 682 F.2d 1344, 1350 (9th Cir.1982). Neither Roe nor RCEB argues that RCEB is an "arm of the state" or is entitled to sovereign immunity. Indeed, RCEB asserts that it is not a state actor at all. In light of this, I

United States District Court
Northern District of California

1  conclude that RCEB is a person for purposes of Section 1983 and discuss below whether Roe has

2  plausibly pleaded that it is a state actor.

3  **2. Under Color of State Law**

4  "Although § 1983 makes liable only those who act 'under color of' state law, even a

5  private entity can, in certain circumstances, be subject to liability under section 1983." *Tsao*, 698

6  F.3d at 1139. "The Supreme Court has articulated four tests for determining whether a private

7  [party's] actions amount to state action: (1) the public function test; (2) the joint action test; (3) the

8  state compulsion test; and (4) the governmental nexus test." *Franklin v. Fox*, 312 F.3d 423, 444-

9  45 (9th Cir. 2002). RCEB is potentially liable as a public actor under at least the governmental

10  nexus test.

11  "[S]tate action may be found if, though only if, there is such a close nexus between the

12  State and the challenged action that seemingly private behavior may be fairly treated as that of the

13  State itself." *Brentwood Acad.*, 531 U.S. at 295 (internal quotation marks and citation omitted).

14  This analysis is necessarily "determined based on the circumstances of each case." *Sutton v.*

15  *Providence St. Joseph Med. Ctr.*, 192 F.3d 826, 836 (9th Cir. 1999) (internal quotation marks and

16  citation omitted). "Typically, the nexus has consisted of participation by the state in an action

17  ostensibly taken by the private entity, through conspiratorial agreement, official cooperation with

18  the private entity to achieve the private entity's goal, or enforcement and ratification of the private

19  entity's chosen action." *Id.*

20  In *Evans v. Newtown*, 382 U.S. 296 (1966), the Supreme Court found that "when private

21  individuals or groups are endowed by the State with powers or functions governmental in nature,

22  they become agencies or instrumentalities of the State and subject to its constitutional limitations."

23  *Id.* at 299. The circumstances of the present case meet this test. RCEB was created by the state

24  with the goal of integrating it into California's broader mental health treatment scheme. CC ¶ 17.

25  In furtherance of that scheme, in which both the State and RCEB seek to accomplish a common

26  goal, the state allows RCEB to involuntarily detain private individuals and may use its coercive

27  power to effectuate RCEB's decisions. Cases that recognize the public function of involuntary

28  commitment support this conclusion. *See Fialkowski v. Greenwich Home for Children*, 683

23

F.Supp. 103, 105 (E.D. Pa. 1987) ("the defendants acted pursuant to direct or delegated state authority" in case involving a developmentally disabled man who died while in the care of a private residential institution); *McHone v. Far Northern Regional Center*, 2015 WL 80676*6 (N.D. Cal., Jan. 5, 2015) ("involuntary commitment of a mentally ill person [is] a traditional coercive state function"); *Ruffler v. Phelps Memorial Hosp.*, 453 F.Supp. 1062 (E.D.N.Y. 1978) (private hospital had performed a public function in its confinement and care of a man who had been involuntarily civilly committed).

RCEB argues that Roe's allegation that it "receives funding from the State, and together with a state agency petitioned the court," is, alone, insufficient to establish the requisite "nexus." RCEB Mot. 8. It understates the allegations concerning its alleged relationship with the state: RCEB was created by state law, acts as part of the State's broader mental health scheme, and assumes by state delegation of power the ability to involuntarily place patients at mental health facilities and retain them there against their will. *See* CC ¶¶ 17, 34, 35, 48. Roe further alleged that RCEB petitioned that the court to commit her to SDC when it was aware of its substandard conditions, failed to explore less restrictive treatment options, and, knowing this, failed to take steps to prevent her abuse. *See* CC 35, 36, 73.

RCEB cites *Morohoshi v Pacific Home*, 34 Cal. 4th 482, 488 (2004) to argue that its primary role is "direct service coordination" and *Kirtley v Ramey*, 326 F. 3d 1088 (9th Cir. 2002) to contend that it cannot be a state actor because the intended benefits of its social advocacy services flow to the individual and not the state. As *Kirtley* points out, there are several fact-sensitive tests that must be conducted to determine whether a private party's function qualifies as state action. *Id*. at 1091. Further factual development may establish that RCEB is not a state actor. But given the reasonable inferences stemming from the allegations described in the preceding paragraph, Roe has plausibly alleged a claim against RECB under Section 1983.

### B. Americans with Disabilities Act

For the purposes of the ADA, a public entity is "any state or local government" or "any department, agency, special purpose district, or other instrumentality of a State or States or local government." 42 U.S.C. § 12131. Roe did not plead sufficient facts for me to determine whether

RCEB constitutes a "public entity." Instead, she recited that it is one. RCEB Mot. 8.

"A pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of action will not do. Nor does a complaint suffice if it tenders naked assertion[s] devoid of further factual enhancement." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Roe's complaint merely states that "RCEB is a 'public entity' under the meaning of the ADA." CC ¶¶ 17, 79. This fails to meet the *Iqbal* pleading standard. I assume Roe agrees, since she fails to address RCEB's argument in her Opposition. *See Marziano v. Cty. of Marin*, No. C-10-2740 EMC, 2010 U.S. Dist. LEXIS 109595, at *10, 2010 WL 3895528 (N.D. Cal. Oct. 4, 2010) (failure to oppose motion to dismiss interpreted as a concession that the claim at issue should be dismissed); *GN Resound A/S v. Callpod, Inc.*, No. C 11-04673 SBA, 2013 U.S. Dist. LEXIS 40402, at *13, 2013 WL 1190651 (N.D. Cal. Mar. 21, 2013) (construing plaintiff's failure to oppose defendant's argument as a concession of said argument). RCEB's motion to dismiss Roe's claim under the ADA is GRANTED.

### C.    California Unruh Civil Rights Act

The Unruh Act prohibits discrimination on the basis of a long list of protected characteristics, including sex and disability, requiring all "business establishments of every kind whatsoever" to provide all persons with "full and equal accommodations, advantages, facilities, privileges, or services." Cal. Civ. Code § 51(b). RCEB claims that it cannot be liable under the Unruh Act because it is a non-profit social services agency, not a "business establishment."

California courts have found that "the term 'business establishments' was used in the broadest sense reasonably possible." *O'Connor v. Vill. Green Owners Ass'n.*, 662 P.2d 427 (Cal. 1983). The *O'Connor* court explained that there is "no reason to insist that profit-seeking be a sine qua non for coverage under the act. Nothing in the language or history of its enactment calls for excluding an organization from its scope simply because it is nonprofit." *Id*. at 430-431; *see also Doe v. California Lutheran High Sch. Ass'n*, 170 Cal. App. 4th 828, 836 (2009) ("An organization is not excluded from the scope [of the act] simply because it is a nonprofit."). Accordingly, any analysis must look beyond whether the corporation in question is for-profit or non-profit to whether the organization has a "businesslike purpose." *O'Connor*, 662 P.2d at 431.

Roe does not plead sufficient facts to establish that RCEB is a "business establishment." She merely recites the elements of a claim under the Unruh Act. *See* CC ¶¶ 17, 134. "[A]llegations in a complaint or counterclaim may not simply recite the elements of a cause of action, but must contain sufficient allegations of underlying facts." *Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011).

On the current record, it is impossible to tell whether RCEB has any of the typical features of a "business establishment"--whether, for example, it has a board of directors, whether it has a large number of employees, whether and whom it charges fees in exchange for services, and other crucial facts are all omitted. *See O'Connor*, 662 P.2d at 431 (finding a nonprofit owners association to be a "business establishment" because it "performs all the customary business functions which in the traditional landlord-tenant relationship rest on the landlord's shoulders"). Roe's claim under the Unruh Act against RCEB is DISMISSED.

## III. INJUNCTIVE RELIEF

In order to receive injunctive relief, the requesting party must show that she has "suffered some actual or threatened injury as a result of the putatively illegal conduct of the defendant, and that the injury fairly can be traced to the challenged action and is likely to be redressed by a favorable decision." *Valley Forge Christian Coll. v. Ams.United for Separation of Church & State*, 454 U.S. 464, 472 (1982). The party requesting relief must also be able to show that he is "realistically threatened by a repetition of the violation." *Gest v. Bradbury*, 443 F.3d 1177, 1181 (9th Cir. 2011). This threat must be "real and immediate." *Chapman v. Pier 1 Imports (U.S.), Inc.*, 631 F.3d 939, 946 (9th Cir. 2011). Roe seeks an injunction to remedy the practices which gave rise to her sexual assault and rape, CC ¶ 76, and to prevent RCEB and DDS from returning her to SDC or a similar institution without her consent. CC ¶ 60.

The State Defendants object to Roe's request for injunctive relief because SDC is scheduled for permanent closure by the end of 2018. State Mot. 18. As a result, they say, Roe's request for injunctive relief is moot--there is no "cognizable danger . . . of recurrence." *Williams v. Alioto*, 549 F.2d 136, 143 (9th Cir. 1977).

The mootness doctrine does not apply where the harm may recur. Because Roe remains

under the care of DDS and RCEB, she still faces the prospect of being recommitted to an institution similar to SDC. "[T]he question is not whether the precise relief sought at the time the application for an injunction was filed is still available. The question is whether there can be *any* effective relief." *Sierra Forest Legacy v. Sherman*, 646 F.3d 1161, 1192 (9th Cir. 2011) (citations omitted) (emphasis in original). Though the precise relief sought will soon no longer be available, there is still the possibility of some effective relief through an injunction, such as barring Roe from being placed at a similar facility. In any case, at the present time SDC remains open and the possibility remains that Roe could be recommitted there.

Even if mootness did apply, the doctrine of voluntary cessation would be relevant. Under this doctrine, mootness only applies where it is "absolutely clear that the allegedly wrongful behavior could not be reasonably expected to recur." *Adarand Constructors, Inc. v. Slater*, 528 U.S. 216, 222 (2000). Here, Roe was voluntarily released from SDC by the State Defendants. Oppo. to State Mot. 17. The State Defendants therefore bear the burden to show that it is not reasonable to expect that Roe will be reinstitutionalized. *Cf. Friends of the Earth v. Laidlaw*, 528 U.S. 167, 189 (2000) (explaining that the party asserting mootness bears the burden of showing that the challenged conduct cannot reasonably be expected to recur). They have failed to make that showing.

Because the mootness doctrine does not apply here--and because, even if it did, the doctrine of voluntary cessation would apply--the State Defendants' motion to dismiss Roe's request for injunctive relief is DENIED.

## CONCLUSION

The State Defendants' and RCEB's motions to dismiss are GRANTED in part and DENIED in part in accordance with this Order, with leave to amend. Roe shall have 20 days to file an amended complaint if she chooses to do so. The State Defendants' motion to strike is

DENIED, and their administrative motion to file under seal is GRANTED.

**IT IS SO ORDERED.**

Dated: May 26, 2017

William H. Orrick
United States District Judge